ANN MIDLER ET AL. *v.* JEFFREY L. BENJAMIN ET AL.
(AC 26121)

McLachlan, Harper and Peters, Js.

Argued February 16—officially released June 6, 2006

*Elizabeth A. B. Suchy,* for the appellants (plaintiffs).

*Frank H. Santoro,* with whom was *Paul T. Edwards,* for the appellees (defendants).

*Opinion*

PETERS, J. A physician may be held responsible for an unfortunate medical outcome either for failure to comply with the prevailing professional standard of medical care or for failure to obtain informed consent. See *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.,* 254 Conn. 131, 757 A.2d 516 (2000). This appeal concerns the law of informed consent. The plaintiffs' principal claim is that the trial court improperly precluded the minor patient and her parents from testifying about what they would have done if the defendant physician had told them that performance of the chin implant surgery that he recommended ran the risk of causing permanent nerve damage to the patient. We conclude that, although the court's rulings were improper in part, they were not sufficiently harmful to require a new trial. Accordingly, we affirm the judgment of the trial court.

On October 16, 1998, the plaintiffs, Ann Midler and her father, Reuben Midler, filed a six count amended revised complaint against the defendant, Jeffrey L. Benjamin, and his professional corporation.[1] The three prin-

---

[1] Benjamin's professional corporation, Jeffrey L. Benjamin, M.D., P.C., is also a defendant in this case. For convenience, we will refer to the defendant in the singular.

cipal counts[2] charged the defendant with negligence, nondisclosure of surgical risks and breach of contract because the surgery that the defendant performed to correct the shape of the minor plaintiff's chin caused permanent injury to her mental nerve.[3] For the purposes of this appeal, the relevant count is the second count in which the plaintiffs alleged that the defendant had a duty to disclose to the minor plaintiff and her parents "all material risks and complications associated with the surgery which he proposed to perform" and "alternative methods of performing that surgery . . . ."[4] A jury returned a general verdict in favor of the defendant. The trial court denied the plaintiffs' motion to set the verdict aside.

The jury reasonably could have found that the seventeen year old plaintiff, Ann Midler, accompanied by her mother, Karen Midler, first met with the defendant on January 14, 1994, to discuss the desirability of a nasalplasty to improve the appearance of the minor plaintiff's nose. The defendant advised them that the minor plaintiff was a suitable candidate for such surgery and added that it would be desirable as well for her to have a chin implant, known as augmentation genioplasty, at the same time. He proposed to perform the genioplasty through the mouth (intraorally). He gave them a bro-

---

[2] The three remaining counts, derivative in nature, were brought by Reuben Midler to recover for expenses that he had incurred, and expected in the future to incur, for the care of his daughter, Ann Midler.

[3] The plaintiffs' expert witness, Arthur Taub, a physician, described the mental nerve as "a little nerve which emerges from a small hole in the lower jaw at about an inch and a half or so below the gum line and at about the level of the first molar tooth." The nerve is called "mental" because the word mentum means chin.

[4] The second count also alleged that "[t]he defendant . . . never informed the plaintiff of any risks or complications associated with the surgery which he proposed to perform and specifically never informed the plaintiff . . . that injury or damage to a nerve in her chin or loss of sensation might be consequences of the augmentation genioplasty which the defendant proposed to perform."

chure providing information about rhinoplasty but no written information about genioplasty. After two more preoperative visits, the minor plaintiff and her mother agreed to go forward with both surgical procedures.

On February 14, 1994, the day of the surgery, the defendant asked Karen Midler to execute an "informed consent" form as guardian for the minor plaintiff. The form identified the proposed surgery as "submucous resection/nasalplasty and augmentation genioplasty" to be performed "on my daughter Ann." The form then stated, in its entirety: "Dr. Benjamin has satisfactorily explained the above procedure, including the expected result, scarring, postoperative course, alternative procedures if applicable in this case, and potential complications. Included in this consent is my authorization that Dr. Benjamin perform this procedure with whatever anesthesia, treatment, dressing, medication, or transfusion is necessary for my care." Concededly, the defendant had not warned the plaintiffs about a risk of permanent nerve damage.

Almost immediately after the surgery, and repeatedly thereafter, the minor plaintiff voiced complaints of numbness and pain in the area of her mental nerve. In response to these enduring complaints, on August 17, 1994, the defendant offered to remove the chin implant. Another surgeon eventually removed the implant, and yet another surgeon thereafter performed another implant operation. In this appeal, the plaintiffs do not claim error in the jury's implicit determination that the defendant did not depart from the accepted standard of care in performing the genioplasty or in responding to the minor plaintiff's complaints of discomfort.[5]

The plaintiffs focus instead on the defendant's acknowledgement at trial that he had not advised the

---

[5] The defendant introduced evidence that some of the patient's complaints had a psychosomatic overlay.

minor plaintiff or her mother of the risk of permanent nerve damage from the genioplasty. He explained that he had never himself seen such a phenomenon and had not been advised of such a possibility by the then available medical literature. The plaintiffs offered expert testimony to the contrary.

In this appeal, the plaintiffs argue that, in the absence of disclosure of this possible risk, they did not give informed consent to the defendant's performance of the genioplasty in any fashion and especially in its performance intraorally, through the mouth, rather than extraorally, through the underside of the chin. In pursuit of this argument, they maintain that the trial court made two improper evidentiary rulings. These rulings prevented the jury from hearing whether (1) the plaintiffs would have proceeded with the surgery if they had been advised of the risk of permanent nerve injury and (2) the defendant had failed to obtain informed consent in another malpractice case. The trial court sustained the defendant's objections to these evidentiary proffers, both at trial, and in response to the plaintiffs' motions to set aside the verdict and the defendant's motion for reconsideration.[6]

Our review of claims of evidentiary impropriety are governed by well established principles. "[W]e will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . [B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Citation omitted; internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 249, 842 A.2d 1100 (2004).

---

[6] After the court denied the plaintiffs' motion to set aside the verdict, the defendant sought articulation of certain of the trial court's analysis and consideration of certain posttrial motions.

I

## THE ELECTION TO GO FORWARD WITH THE SURGERY

One of the disputed questions at trial was whether the defendant informed the plaintiffs that genioplasty could be performed either intraorally or extraorally. The plaintiffs presented expert testimony that extraoral augmentation was less likely to impact the mental nerve that, according to the plaintiffs, was permanently injured as a result of the genioplasty performed by the defendant. The plaintiffs attempted to make an evidentiary showing that the absence of the relevant information had an effect on their consent to the genioplasty.

When the minor plaintiff was testifying, she was asked: "[I]n January or February of 1994, if [the defendant] had told you that there was a risk of permanent nerve damage when doing the chin implant procedure that you had done, would you have undergone that procedure?" The trial court sustained the defendant's objection to this question as too speculative because the minor plaintiff had no life experiences that she could have brought to bear in answering it. It was not persuaded by the plaintiffs' citation of *Burns* v. *Hanson*, 249 Conn. 809, 734 A.2d 964 (1999), as authority for the admissibility of such evidence.

Karen Midler accompanied the minor plaintiff in each of her consultations with the defendant. On the witness stand, she was asked the following question: "[I]f during that January-February, 1994 period [the defendant] had told you that there was a risk of permanent nerve damage when doing a chin implant procedure, would you have allowed your [minor] daughter at that time, who was seventeen, Ann, to undergo this procedure?" The court again sustained the objection on the ground that the question was too speculative, again considering *Burns* to be unpersuasive. Subsequently, during cross-

examination by the defendant, the mother testified that she herself had had similar surgery, with an extraoral implant. She had not, however, discussed her own history with the defendant when he described the procedure he intended to follow.

The plaintiff Reuben Midler, the patient's father, was also asked a similar question. "[I]n that January or February of 1994 time period, if [the defendant] had advised your wife—or your daughter, I should say, that there was a risk of permanent nerve damage when doing a chin implant, would you have allowed . . . your daughter to undergo the procedure?" Again the defendant objected and the court sustained the objection for the same reason.

The plaintiffs maintain that these rulings were improper because the trial court took too constrained a view of the evidentiary principle articulated in *Burns* that, in medical malpractice cases, a patient or her surrogate may testify about the choices that better information would have allowed the patient to make. We agree in part.

In *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 265 Conn. 79, 105, 828 A.2d 31 (2003), our Supreme Court recently restated the holding in *Burns*. The court stated: "In *Burns*, we addressed the admissibility of arguably speculative testimony in a medical malpractice case. The plaintiff, a woman suffering from severe multiple sclerosis, brought a wrongful birth claim against the defendant gynecologist who, 'knowing both of her condition and that it was medically undesirable for her to become pregnant, incorrectly advised her that she was sterile and failed to diagnose her pregnancy after an examination early in her second trimester.' . . . The trial court had precluded the plaintiff from testifying that she likely would have chosen to have had an abortion had the physician told her that she was pregnant

in a timely fashion, concluding that such testimony was speculative. . . . We reversed the ruling of the trial court, concluding that the plaintiff's testimony as to what she would have done had the defendant advised her that she was pregnant was not speculative but, rather, was based on her personal knowledge." (Citations omitted.) Id., 106–107.

Importantly, in *DiLieto*, the Supreme Court held that the evidentiary ruling in *Burns* did not depend on the witness' "hav[ing] personal experience with a particular procedure before being able to testify as to whether he or she would have undergone that procedure." Id., 107–108. The court clarified that in *Burns*, "the testimony was admissible because it was based on the plaintiff's personal knowledge and life experience, and therefore was not speculative." Id., 108. The Supreme Court then concluded that the trial court improperly excluded DiLieto's testimony as speculative, stating that "DiLieto, a woman in her forties, could have testified, based on her personal knowledge and life experience, whether she would have undergone the hysterectomy knowing that her condition might have been benign." Id.

We reject the defendant's contention that *DiLieto*'s restatement of the case law established by *Burns* does not govern this case because of a principle barring retroactivity in the law. The fact is that both the trial court in *DiLieto* and the trial court in this case read *Burns* too narrowly. We need not, therefore, explore the extent to which changes in the common law implicate the principles of retroactivity traditionally associated with changes in statutory law.

The defendant is on stronger ground in his alternative argument that, with respect to the minor plaintiff, her personal knowledge and life experience was too meager to remove her proffered testimony from the realm of

the speculative. The trial court made such a finding. It was not a clear abuse of the court's discretion to so find.

The trial court did not, however, make any finding with respect to the life experiences of Ann Midler's parents. For both of them, their personal knowledge and life experience should have been accepted as a reasonable, nonspeculative basis for making an informed decision balancing the surgical risks and benefits of an intraoral genioplasty for their daughter. The mother's history of having had a genioplasty further underscores the admissibility of the testimony that she was prohibited from presenting to the jury. We conclude, therefore, that the court abused its discretion in upholding the defendant's objections to this proposed testimony.

In light of this conclusion, we must now decide whether the plaintiffs have demonstrated that the court's improper rulings were harmful. In its entirety, the plaintiffs' argument on this issue consists of their assertion that the court's action "clearly placed [them] at a distinct disadvantage with respect to the jury consideration of the claim that the defendant failed to obtain the plaintiffs' informed consent from her or her mother. The court's action effectively took a major part of the plaintiffs' claim of a lack of informed consent from the jury."

By way of rebuttal, the defendant points to the fact that the trial court expressly found that, if its ruling was improper, it was harmless. That finding is supported by the testimony of the plaintiffs' expert witness that permanent nerve damage from a chin implant is extremely rare and that, in his experience, patients who had been advised of this risk had never declined to undergo the procedure. Thus, regardless of whether the defendant had a duty to disclose the risk of permanent nerve injury associated with an intraoral genioplasty,

it would have been highly unlikely for the jury to have found a causal connection between this breach and the plaintiffs' consent to the performance of this surgery.

On this record, we are persuaded that the trial court's exclusion of the proffered testimony would not likely have affected the result of the trial. The court's rulings were therefore harmless error and do not warrant setting its judgment aside.

## II

The plaintiffs' alternate claim of evidentiary impropriety is based on their unsuccessful effort to introduce evidence at trial that, on a previous occasion, the defendant was sued on a malpractice claim of failure to obtain informed consent. As in this case, the defendant was charged with having failed to prepare proper documentation of the manner in which he discharged his obligation to assure that his patient understood the risks of the medical procedure that was being contemplated.

The plaintiffs attempted to introduce this evidence in connection with their examination of the defendant on the witness stand. The plaintiffs' counsel informed the court that "the claim has to go with credibility with respect to the [defendant's] testimony as to whether or not he documents risks of procedures or complications of procedures. . . ." Counsel wanted to refer to a specific case, from the mid-1980s, that also involved a claim of lack of informed consent, although the issue there was not nerve damage but scarring.

The trial court upheld the defendant's objection to this proposed evidence. The court found that the evidence was of little relevance to the present case and that its probative value would be outweighed by the prejudicial inference that a juror might draw from the fact that there was a prior lawsuit against this defendant.

In their appeal, the plaintiffs claim that their evidentiary proffer was relevant to support their claim that the defendant was aware of the necessity of documenting informed consent. That claim is, however, a nonissue. The defendant never denied that it was his responsibility to inform the plaintiffs of the risks and benefits of the proposed genioplasty before he performed it. It was his testimony that he had fulfilled this responsibility.

In its memorandum of decision on the plaintiffs' motion to set aside the jury's verdict, the trial court held that "[t]here was no competent evidence offered at trial that the defendant's failure to document in any way caused the plaintiff's alleged injuries." The plaintiffs' appellate brief does not challenge the validity of this finding.

As the defendant observes, the two cases on which the plaintiffs rely are not persuasive because they are readily distinguishable. In *Duffy* v. *Flagg*, 88 Conn. App. 484, 490, 869 A.2d 1270, cert. granted, 274 Conn. 909, 876 A.2d 1201 (2005), we reversed a medical malpractice judgment because the plaintiff in that case had been precluded from presenting testimony that her consent to a medical procedure had been obtained on the basis of an incomplete and misleading answer to a question regarding the physician's experience with the procedure with prior patients. No such question and answer are alleged to have been have been presented in this case. In *DeGennaro* v. *Tandon*, 89 Conn. App. 183, 197, 873 A.2d 191, cert. denied, 274 Conn. 914, 879 A.2d 892 (2005), we upheld a medical malpractice judgment based in part on evidence that a dental provider was operating in an understaffed office and was using unfamiliar equipment. The plaintiffs in this case have made no comparable allegations about the competence of this defendant. In short, those cases do not provide enlightenment for this one.

The judgment is affirmed.

In this opinion the other judges concurred.